PEOPLE v BENTON

Docket No. 56956. Argued June 8, 1976 (Calendar No. 10).—Decided November 28, 1977.

Fred Benton was convicted by a jury in Recorder's Court of Detroit, Geraldine Bledsoe Ford, J., of armed robbery. In a previous trial on the same charge the prosecution called as a witness a former codefendant, Tommy McBride, and attempted to impeach him by reading a statement he made to the police after he was arrested with the defendant. The first trial resulted in a mistrial declared on the court's own motion because the prosecution impeached its own witness and the statement was read to the jury before a proper foundation was laid. At the second trial a motion by the defendant to dismiss the charges on grounds of double jeopardy was denied. The Court of Appeals, V. J. Brennan, P. J., and J. H. Gillis and D. F. Walsh, JJ., affirmed per curiam (Docket No. 19196). Defendant appeals. *Held:* The conviction is reversed.

Justice Levin, joined by the Chief Justice and Justice Williams, wrote:

1. If a defendant moves for or consents to the declaration of a mistrial he ordinarily will be deemed to have waived any claim of double jeopardy. The important consideration for the purpose of determining whether a defendant has consented to a mistrial is that the defendant retain primary control over the

REFERENCES FOR POINTS IN HEADNOTES
[1–3, 12, 15–17] 21 Am Jur 2d, Criminal Law § 195.
What constitutes accused's consent to court's discharge of jury or to grant of state's motion for mistrial which will constitute waiver of former jeopardy plea. 63 ALR2d 782.
[4] 21 Am Jur 2d, Criminal Law § 194.
[5, 13] 76 Am Jur 2d, Trial § 1080.
[6] 21 Am Jur 2d, Criminal Law § 180.
[7] 81 Am Jur 2d, Witnesses §§ 481, 619–631.
[8] 81 Am Jur 2d, Witnesses § 2.
[9, 10] 81 Am Jur 2d, Witnesses § 522.
[11] 76 Am Jur 2d, Trial §§ 1083–1089.
[14] 75 Am Jur 2d, Trial § 687.
81 Am Jur 2d, Witnesses § 645.

course to be followed. In the instant case there is no indication that the defendant or his counsel consented to a mistrial and there is substantial evidence that his counsel objected. It is also apparent that the trial court recognized that the declaration of a mistrial was without the defendant's consent, but found it manifestly necessary. Whether the declaration of a mistrial was a manifest necessity depends on whether the defect in the proceedings would have required reversal if a verdict of guilty had resulted at the first trial, or, if the defect was not so pervasive, whether a scrupulous exercise of judicial discretion would have revealed a less drastic remedy than declaration of a mistrial.

2. The prosecution was not obliged to call the alleged accomplice, McBride, as a res gestae witness. By calling him as a witness without being obliged the prosecution became subject to the rule that a party may not impeach its own witness. It was improper for the prosecution to impeach McBride and the impropriety was compounded by the failure to lay a proper foundation for reading his prior statement. However, the Court of Appeals has declined to consider the issue in other cases where the defendant has not objected at trial to preserve the issue for appeal. Therefore, it is unlikely that if the defendant had been convicted at the first trial the conviction would have been reversed on the basis of the defect which the trial court perceived.

3. There was no record of any discussion with counsel of the efficacy of alternative curative measures. The impropriety appears to have been primarily in the order of proof. Any prejudicial effect of confronting McBride with his inconsistent statement was mitigated by his testimony on redirect examination that his statement to police was untrue. Under the circumstances it would have been proper to give a cautionary instruction to the jury on the limited use for which an inconsistent statement may be used. In the instant case correct procedures were not followed to ascertain the wishes of the defendant and his counsel and to fully explore the significance of the error and alternative remedies. Instead an unnecessary mistrial was declared which entailed not only a delay for the defendant, but also operated as a post-jeopardy continuance to allow the prosecution an opportunity to strengthen its case.

Justice Fitzgerald, joined by Justices Coleman and Ryan, concurred in reversal and agreed that there was no "manifest necessity" for declaring a mistrial. The difficult question in this case is whether the defendant consented to the mistrial. The record does not show that the defendant had "primary control"

over the course to be followed; therefore he did not consent and retrial is barred under the Double Jeopardy Clause.

Reversed.

Opinion for Reversal by Levin, J.

Kavanagh, C. J., and Williams, J.

1. Criminal Law—Double Jeopardy—Mistrial—Consent.

A defendant will ordinarily be deemed to have waived any claim of double jeopardy on the retrial of a charge if he moves for or consents to the declaration of a mistrial in the first trial (US Const, Am V; Const (1963, art 1, § 15).

2. Criminal Law—Double Jeopardy—Mistrial—Consent.

The important consideration, for purposes of the Double Jeopardy Clause, in determining whether a defendant has consented to a mistrial is that the defendant retain primary control over the course to be followed (US Const, Am V; Const 1963, art 1, § 15).

3. Criminal Law—Double Jeopardy—Mistrial—Consent.

A defendant's silence or failure to object to a declaration of mistrial does not constitute the requisite affirmative showing of consent on the record; the defendant must do something positively in order to indicate that he is exercising that primary control over the course to be followed and consents to the mistrial.

4. Criminal Law—Trial—Mistrial—Manifest Necessity.

Courts have the authority to discharge a jury from giving any verdict whenever, taking all the circumstances into consideration, there is a manifest necessity for the act or the ends of public justice would otherwise be defeated.

5. Criminal Law—Trial—Mistrial.

*A trial judge properly exercises his discretion to declare a mistrial if a verdict of conviction would necessarily be reversed on appeal because of an obvious serious procedural error in the trial.*

6. Criminal Law—Trial—Mistrial—Alternative Measures.

*A trial judge must consider alternative curative measures before declaring a mistrial* sua sponte; *however, the Double Jeopardy Clause will not bar retrial even though the examination of alternatives is not undertaken if to do so would be futile because clearly no reasonable alternative existed (US Const, Am V; Const 1963, art 1, § 15).*

7. Cʀɪᴍɪɴᴀʟ Lᴀᴡ—Wɪᴛɴᴇssᴇs—Iᴍᴘᴇᴀᴄʜᴍᴇɴᴛ—Rᴇs Gᴇsᴛᴀᴇ Wɪᴛ-
ɴᴇssᴇs.

*A party generally may not impeach his own witness; however,
the people may cross-examine and impeach res gestae witnesses
whom they are required by law to produce at trial (MCL
767.40a; MSA 28.980[1]).*

8. Cʀɪᴍɪɴᴀʟ Lᴀᴡ—Wɪᴛɴᴇssᴇs—Rᴇs Gᴇsᴛᴀᴇ Wɪᴛɴᴇssᴇs—Aᴄᴄᴏᴍᴘʟɪᴄᴇs.

*The duty of the people to call res gestae witnesses does not
extend to accomplices (MCL 767.40; MSA 28.980).*

9. Cʀɪᴍɪɴᴀʟ Lᴀᴡ—Wɪᴛɴᴇssᴇs—Iᴍᴘᴇᴀᴄʜᴍᴇɴᴛ—Aᴄᴄᴏᴍᴘʟɪᴄᴇs.

*The people may not call a defendant's accomplice as their witness
and impeach him (MCL 767.40, 767.40a; MSA 28.980, 28.980[1]).*

10. Cʀɪᴍɪɴᴀʟ Lᴀᴡ—Tʀɪᴀʟ—Mɪsᴛʀɪᴀʟ—Mᴀɴɪғᴇsᴛ Nᴇᴄᴇssɪᴛʏ—Wɪᴛ-
ɴᴇssᴇs—Iᴍᴘᴇᴀᴄʜᴍᴇɴᴛ—Aᴄᴄᴏᴍᴘʟɪᴄᴇs.

*The Court of Appeals, although recognizing that it is improper
for a prosecutor to impeach an accomplice whom he calls as a
witness, has declined to consider the issue where it has not
been preserved by objection in the trial court; although the
procedure is improper, it is not of such importance as to
mandate reversal on appeal and therefore does not cause a
"manifest necessity" for declaration of a mistrial on the court's
own motion.*

11. Cʀɪᴍɪɴᴀʟ Lᴀᴡ—Tʀɪᴀʟ—Mɪsᴛʀɪᴀʟ.

*The power to discharge a jury before a verdict should be exer-
cised with greatest caution, under urgent circumstances, and
for very plain and obvious causes.*

12. Cʀɪᴍɪɴᴀʟ Lᴀᴡ—Tʀɪᴀʟ—Mɪsᴛʀɪᴀʟ—Dᴏᴜʙʟᴇ Jᴇᴏᴘᴀʀᴅʏ.

*The Double Jeopardy Clause stands as a protection against expos-
ing the defendant not only to the burden of retrial and the
possible loss of a favorable tribunal, but also the possibility that
the government will improve the strength of its case signifi-
cantly in the second prosecution (US Const, Am V; Const 1963,
art 1, § 15).*

13. Cʀɪᴍɪɴᴀʟ Lᴀᴡ—Tʀɪᴀʟ—Mɪsᴛʀɪᴀʟ—Aʟᴛᴇʀɴᴀᴛɪᴠᴇ Mᴇᴀsᴜʀᴇs.

*A trial judge, before declaring a mistrial sua sponte, must make
explicit findings, after eliciting the opinions of counsel and
holding a hearing on the record, that no reasonable alternative
exists.*

14. CRIMINAL LAW—TRIAL—MISTRIAL—WITNESS—IMPEACHMENT—OR-
    DER OF PROOF—ALTERNATIVE MEASURES.

    *A cautionary instruction to the jury on the limited use for which
    an inconsistent statement may be used is proper, rather than a
    sua sponte declaration of mistrial, where the procedural defect
    is primarily in the order of proof by confronting a witness with
    a prior statement in an attempt to impeach his testimony
    before a proper foundation has been laid.*

              CONCURRING OPINION BY FITZGERALD, J.

                   RYAN and COLEMAN, JJ.

15. CRIMINAL LAW—TRIAL—MISTRIAL—DOUBLE JEOPARDY.

    *Retrial is ordinarily not barred when a defendant consents to a
    mistrial after jeopardy has attached (US Const, Am V; Const
    1963, art 1, § 15).*

16. CRIMINAL LAW—TRIAL—MISTRIAL—CONSENT.

    *The proper inquiry in determining whether a defendant con-
    sented to a mistrial is whether he had primary control over the
    course to be followed.*

17. CRIMINAL LAW—TRIAL—MISTRIAL—DOUBLE JEOPARDY.

    *Retrial following a sua sponte declaration of mistrial is barred on
    grounds of double jeopardy where there is no manifest neces-
    sity for the declaration of mistrial and it is not apparent from
    the record that the defendant consented to the declaration (US
    Const, Am V; Const 1963, art 1, § 15).*

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, *William L. Cahalan,*
Prosecuting Attorney, *Edward Reilly Wilson,* Re-
search, Training & Appeals, and *Ronald P. Weitz-
man,* Assistant Prosecuting Attorney, for the peo-
ple.

*Carl Ziemba* for defendant.

LEVIN, J. The issue is whether re-prosecution of
the defendant following the trial judge's *sua
sponte* mid-trial declaration of a mistrial was vio-

lative of the Double Jeopardy Clause.[1] We hold that it was and that the information should be dismissed.

## I

Fred Benton was charged with armed robbery. The first trial commenced July 30, 1973. On the first day of that trial—after the prosecution had called all the witnesses who were to testify at the second trial, with the exception of the officer in charge of the case, who at the second trial testified solely with regard to unsuccessful efforts to produce two res gestae witnesses—the people called Tommy McBride. McBride had also been charged with the commission of the offense but was not bound over for trial.

The prosecutor's direct examination was devoted entirely to eliciting a statement made by McBride to the police. McBride recognized his signature on the statement, but could not recall making it. He said that he was under the influence of narcotics during and immediately after his arrest. The statement inculpated Benton and was read into the record in the form of a question.[2] There was no objection by defense counsel.

---

[1] The Double Jeopardy Clause of the Fifth Amendment applies to the states through the Fourteenth Amendment. *Benton v Maryland*, 395 US 784; 89 S Ct 2056; 23 L Ed 2d 707 (1969). Const 1963, art 1, § 15, additionally protects a defendant from being placed twice in jeopardy.

[2] "*Q.* And did you make a statement concerning a robbery at 6562 Linwood?
"*A.* Well at the time * * *
"*Q. (interposing):* Yes or no, please. Did you make a statement?
"*A.* Yes.
"*Q.* Did you sign that statement?
"*A.* I think so.
"*Q.* Is this (indicating) your signature?
"*A.* Yes.
"*Q.* O.K. And this would be the statement, then, that you made, is that correct (indicating), if you signed it?

* * *

Cross-examination explored the extent of Mc-
Bride's drug intoxication at the time the statement
was made. On redirect, McBride asserted that the
statement was untrue. The truth was that a man
had run up to the car in which, immediately after
the robbery, he and Benton were seated and threw
a pistol and wallet into the back seat of the car.[3]

---

"*A.* Yes.

"*Q.* Mr. McBride, did you tell the officer, then, that James Johnson
had nothing to do with the holdup, that (reading) 'Me and James
Robinson, the other man arrested with me and Johnson, went into
the TV shop, I was not armed, I didn't know James Robinson had a
gun, either. Me and James walked in. I stayed up front a while.
James took the owner into the back room. I went behind the counter
looking for money. I didn't find any money. And I didn't know how
much James got from the owner and the other man that was there,
also. We left the store and walked up Linwood until I saw James
Johnson coming in his car. We then got in the car, with me in the
front seat and James Robinson in the back seat. The police then came
and arrested us.' And it is signed Tommy McBride. Did you make
that statement?

"*A:* I was under the influence of drugs. I don't really * * *

"*Q. (interposing):* Did you make that statement?

"*A.* I really don't know. I made a statement. I don't recall what I
said.

"*Q.* Is that your signature?

"*A.* That is my signature.

"*Mr. Horn:* I have no further questions."

James Robinson is an alias for defendant Benton.

[3] "*Q. (by Mr. Horn):* Would you tell us what happened December
22nd.

"*A.* Yes. You mean before I was arrested?

"*Q.* Yes, the events that led up to your being arrested.

"*A.* Well, I don't know exactly what time, but Johnson the owner of
the car came by on Linwood and Virginia Park at the Pink Lady Bar
and picked * * *

"*Q. (interposing):* Which bar?

"*A.* Pink Lady.

"*Q.* Where is that?

"*A.* It is on Linwood and Virginia Park, I think, and from there we
went to a beauty salon on Ferry Park. He was going to see about
getting his hair weaved. And while we was sitting in the car waiting
guys came by.

"*Q.* Guys came by?

"*A.* One guy.

"*Q.* One guy?

At the beginning of the second day of trial, the judge, *sua sponte,* declared a mistrial. She said that the prosecutor had improperly impeached McBride, that McBride's testimony was prejudicial to Benton and that a cautionary instruction would not be efficacious.

Benton's second trial began October 1, 1973. His motion to dismiss on the ground that he had previously been placed in jeopardy on the same charge was denied. He was convicted and the Court of Appeals affirmed.

## II

It is established that if the defendant himself moves for or consents to the declaration of a mistrial he will ordinarily be deemed to have waived any double jeopardy claim. In determining whether the defendant has consented to a mistrial, the United States Supreme Court declared, in a case where the defendant's mistrial motion was assertedly occasioned by judicial error,[4] that "[t]he important consideration, for purposes of the Double Jeopardy Clause, is that the defendant retain primary control over the course to be followed". *United States v Dinitz,* 424 US 600, 607–609; 96 S Ct 1075; 47 L Ed 2d 267 (1976). This Court, on the authority of *Dinitz,* has declared that the defendant must "do something positively in order to

"*A.* Yes. And he ran to the car and asked us do we want to make some money and I said 'What?' He said 'Drop me off.' I said 'I'm not driving.' So by this time Johnson come out of the beauty salon and gets in the car and we see a scout car cruising, coming by us. The guy, I don't know who he was, he kept inquiring he wanted a lift. We told him we had some business to take care of. He takes a pistol and wallet and throws it in the back seat and walks away. And as we was getting ready to pull away the police stopped us."

[4] There is no claim here of judicial or prosecutorial misconduct designed to avoid a jury verdict at the first trial. *United States v Glover,* 506 F2d 291 (CA 2, 1974); *State v Marquez,* 113 Ariz 540; 558 P2d 692 (1976).

indicate he or she is exercising that primary control".[5] Defendant's silence or failure to object to a declaration of mistrial does not constitute the requisite affirmative showing on the record.[6]

In the instant case, there is no indication that Benton or his counsel consented to a mistrial and there is substantial evidence that his counsel objected. In declaring a mistrial, the judge relied on *United States v Compton,* 365 F2d 1 (CA 6, 1966), where counsel for a witness called by the government had advised the court that the witness would claim the Fifth Amendment privilege against self-incrimination and, over objection, the government read into the record in the form of a question a purported statement given by the witness to the FBI. It appears that counsel for Benton may have argued that *Compton* was distinguishable because McBride had not asserted his Fifth Amendment privilege: "I just wanted the court to note my objection raised yesterday as to this Fifth Amendment argument."[7]

In declaring a mistrial, the judge in the instant case said:

"And the Court is mindful, also, of the case of *People v Grimmett* [388 Mich 590; 202 NW2d 278 (1972)], where it indicated that, at least in general terms, if a mistrial were declared without the consent of the defendant that the defendant could not be tried under the abiding principle of double jeopardy."

It is apparent that the judge was aware that she

[5] *People v Alvin Johnson,* 396 Mich 424, 432–433; 240 NW2d 729 (1976).

[6] *People v Grimmett,* 388 Mich 590, 601; 202 NW2d 278 (1972); *People v Gardner,* 37 Mich App 520; 195 NW2d 62 (1972); *United States v Grasso,* 552 F2d 46, 49–50 (CA 2, 1977); *Curry v Superior Court of San Francisco,* 2 Cal 3d 707, 713; 87 Cal Rptr 361; 470 P2d 345, 348 (1970).

[7] It is also distinguishable because Compton's counsel had objected to the reading of the statement and Benton's counsel did not.

was declaring a mistrial without Benton's consent and that, indeed, her action gave rise to an arguable defense of double jeopardy. She concluded, nevertheless, that she would declare a mistrial because the circumstances caused "the court to feel it was manifestly necessary to declare a mistrial in this cause because [of] the plain error which erroneously did occur".

## III

The governing standard, manifest necessity, was enunciated in *United States v Perez,* 22 US (9 Wheat) 579, 580; 6 L Ed 165 (1824): "[T]he law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated."[8]

"Manifest necessity" has escaped precise formulation.[9] Indeed, the United States Supreme Court has followed an uncertain course in applying *Perez.* In *Gori v United States,* 367 US 364, 369; 81 S Ct 1523; 6 L Ed 2d 901 (1961), the Court declared that a *sua sponte* mistrial did not bar retrial if the mistrial had been declared "in the sole interest of the defendant". Subsequently the Court declared that the *Gori* test "does not adequately satisfy the policies underpinning the double jeopardy provision".[10] *United States v Jorn,* 400 US 470, 483; 91 S Ct 547; 27 L Ed 2d 543 (1971).

---

[8] *See People v Alvin Johnson, supra,* p 434.

[9] *See* Schulhofer, *Jeopardy and Mistrials,* 125 U Pa L Rev 449 (1977); Comment, *Double Jeopardy and Reprosecution After Mistrial: Is the Manifest Necessity Test Manifestly Necessary?,* 69 NW U L Rev 887 (1975), and Note, *Mistrial and Double Jeopardy,* 49 NY U L Rev 937 (1974).

[10] Justice Harlan explained the underlying rationale of *United*

*Jorn* requires that the judge consider viable alternative curative measures before *sua sponte* declaring a mistrial.[11] As stated in *Dinitz,* quoting from *Jorn,* in the absence of a motion by a defendant for a mistrial, " 'the *Perez* doctrine of manifest necessity stands as a command to trial judges not to foreclose the defendant's option until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings' ".

In *Illinois v Somerville,* 410 US 458, 464, 471; 93 S Ct 1066; 35 L Ed 2d 425 (1973), the Court ruled that there was manifest necessity where under local law a defect in the indictment was not curable by amendment and could not be waived by the defendant's failure to object: "A trial judge properly exercises his discretion to declare a mistrial if an impartial verdict cannot be reached, or if a verdict of conviction * * * would have to be reversed on appeal due to an obvious procedural error in the trial."[12]

The United States Court of Appeals for the Second Circuit reconciled *Somerville* and *Jorn* in these terms:

---

*States v Jorn,* 400 US 470; 91 S Ct 547; 27 L Ed 2d 543 (1971), as follows:

"[I]ndependent of the threat of bad-faith conduct by judge or prosecutor, the defendant has a significant interest in the decision whether or not to take the case from the jury when circumstances occur which might be thought to warrant a declaration of mistrial." *Id.* p 485.

[11] *United States v Grasso, supra,* p 52; *Arizona v Washington,* 546 F2d 829, 832 (CA 9, 1976); *United States ex rel Stewart v Hewitt,* 517 F2d 993, 996 (CA 3, 1975); *United States v Lansdown,* 460 F2d 164, 168–169 (CA 4, 1972).

[12] The Court continued:

"But where the declaration of a mistrial implements a reasonable state policy and aborts a proceeding that at best would have produced a verdict that could have been upset at will by one of the parties, the defendant's interest in proceeding to verdict is outweighed by the competing and equally legitimate demand for public justice." *Illinois v Somerville,* 410 US 458, 471; 93 S Ct 1066; 35 L Ed 2d 425 (1973).

"*Somerville* holds, then, that the double jeopardy clause will not bar retrial even though the examination of alternatives mandated by *Jorn* is not undertaken if to do so would be futile because clearly no reasonable alternative existed." *United States v Grasso,* 552 F2d 46, 52, fn 2 (CA 2, 1977).[13]

We turn to a consideration of whether the nature of the defect in the proceedings was such that if a guilty verdict had been rendered at the first trial the conviction "would have [had] to be reversed on appeal" *(Somerville, supra,* p 464)[14] and whether, if the defect was not so pervasive, a "scrupulous exercise of judicial discretion" would have revealed a less drastic remedy than declaration of a mistrial *(Jorn, supra,* pp 484–485).

## IV

The procedural defect here would not have required reversal had Benton been convicted at the first trial.

While a prosecutor is obliged to call res gestae witnesses and, therefore, does not vouch for their credibility and may impeach them "the same as though such witnesses had been called by the respondent", MCLA 767.40a; MSA 28.980(1), a prosecutor is not obliged to call an accomplice.[15] "Absent [such] obligation, a witness thus called becomes the people's witness and subject to the

---

[13] *See* Note, *supra,* 49 NY U L Rev, pp 947–948.

[14] In *Somerville,* the procedural error was of such importance as to mandate reversal on appeal and another trial: "A trial judge properly exercises his discretion to declare a mistrial * * * if a verdict of conviction * * * would have to be reversed on appeal due to an obvious procedural error in the trial"; where "reversal on appeal [is] a certainty" and "automatic." *Somerville, supra,* p 464.

[15] *People v Raider,* 256 Mich 131, 135–136; 239 NW 387 (1931); *People v Threlkeld,* 47 Mich App 691; 209 NW2d 852 (1973).

settled rules concerning the examination of any witness voluntarily called by either party."[16]

McBride, along with Benton, had been charged with commission of the armed robbery and, therefore, may properly be characterized as an accomplice. (If he is not regarded as an accomplice, what occurred would, because of the prosecutor's undoubted right to impeach res gestae witnesses whom he is obliged to call, have been less objectionable.)

Proceeding on the assumption that McBride was an accomplice, the prosecutor could not properly impeach him (his own witness) by use of a prior statement,[17] and the error was compounded by launching the impeachment without a foundation in the form of inconsistent direct testimony.

Although what occurred was improper, it does not follow that there was manifest necessity for declaration of a mistrial.

In affirming Benton's conviction, the Court of Appeals said that if a mistrial had not been declared and Benton had been found guilty he "would certainly have *assigned* such a failure as error on appeal" (emphasis supplied). The accuracy of that assumption is debatable; be that as it may, manifest necessity does not arise because the defendant may, providently or improvidently, assign error.

The history of adjudication in the Court of Appeals demonstrates that if Benton had been convicted at the first trial it is unlikely that his conviction would have been reversed because of the defect perceived by the judge. In *People v Coates,* 40 Mich App 212, 214; 198 NW2d 837

---

[16] *People v Fidel,* 37 Mich App 338, 342–343; 194 NW2d 732 (1971); *People v White,* 401 Mich 482; 257 NW2d 912 (1977).

[17] *People v Fidel, supra; People v White, supra.*

(1972), and *People v St Onge,* 63 Mich App 16, 18–
19; 233 NW2d 874 (1975), the Court of Appeals,
recognizing that it is improper for a prosecutor to
impeach an accomplice whom he calls, declined to
consider the issue because of failure to preserve
the issue for appeal by objection. Benton's counsel
did not object to the improper examination of
McBride.

The judge's reliance on *Compton* was misplaced.
In that case, the prosecutor knew that the witness
would invoke his Fifth Amendment privilege not
to incriminate himself[18] and defense counsel ob-
jected to the questioning. McBride did not invoke
his Fifth Amendment privilege; he testified freely
on both direct and cross-examination without ob-
jection by Benton's counsel.

We conclude that, although the direct examina-
tion was improper and there was a defect in the
proceedings, it is improbable that Benton would on
that account have obtained a reversal on appeal if
he had been convicted at his first trial.

## V

There was a less drastic alternative which a
scrupulous exercise of judicial discretion would
have revealed.

The power to discharge a jury before a verdict
should be exercised "with the greatest caution,
under urgent circumstances, and for very plain
and obvious causes". *United States v Perez, supra,*
p 580.

"[W]here the judge, acting without the defend-

---

[18] This Court has held that because of "the danger that an adverse
inference may be drawn from a claim of testimonial privilege", it is
improper for the prosecutor to call a witness whom he knows will
invoke the privilege. *People v Giacalone,* 399 Mich 642, 646; 250
NW2d 492 (1977).

ant's consent, aborts the proceeding, the defendant has been deprived of his 'valued right to have his trial completed by a particular tribunal.' " *United States v Jorn, supra,* p 484. Before a trial judge *sua sponte* declares a mistrial he or she should make explicit findings, after a hearing on the record, that no reasonable alternative exists.[19]

In the instant case there was no record of any discussion with counsel of the efficacy of alternative curative measures. A thorough consideration of the situation with counsel would have revealed that the improperly of confronting McBride with his inconsistent statement on direct was mitigated by his subsequent testimony.

The impropriety appears to have been primarily in the order of proof. McBride's prior statement might have been admissible to impeach his apparently unexpected testimony.[20] Under the circumstances, it would have been in order to give a

---

[19] *See United States v Jorn, supra,* pp 484–485; *United States v Grasso, supra,* p 52; *United States v Tinney,* 473 F2d 1085 (CA 3, 1973); Note, *supra,* 49 NY U L Rev, p 952.

[20] *See Hileman v Indreica,* 385 Mich 1, 8; 187 NW2d 411 (1971). It does not appear that the prosecutor knew that McBride would testify in a manner inconsistent with his prior statement. If the testimony was not unexpected then the cause of the mistrial might have been prosecutorial misconduct, posing still other issues which our disposition makes it unnecessary to reach. *See* fn 4, *supra.*

It may still be maintained that McBride's statement improperly read into the record was so prejudicial as to constitute plain error. The procedural defect was not, however, of that magnitude.

Before McBride testified, a wealth of evidence had been introduced establishing Benton's guilt. The victim positively identified him. Police officers testified that the victim's personal property and identification cards were found on Benton's person when he was arrested in the vicinity of the crime not more than ten minutes after the robbery. A revolver and approximately $280 was taken from Benton's person and the car. On retrial the prosecution did not call McBride as a witness. While the prosecution's impeachment of McBride on direct examination was a defect in the proceedings, in light of the nature of the defect, which does not go to the integrity of the judicial process, the failure of Benton's counsel to object and the overwhelming evidence against Benton, the defect was not plain error.

cautionary instruction on the limited use for which an inconsistent statement may be used.[21] In contrast with *People v White,* 401 Mich 482; 257 NW2d 912 (1977), it does not appear that the prosecutor knew that the witness would testify in a manner inconsistent with his earlier statement.

The declaration of a mistrial "entailed not only a delay for the defendant, but also operated as a post-jeopardy continuance to allow the prosecution an opportunity to strengthen its case". *Illinois v Somerville, supra,* p 469. At the subsequent trial the prosecutor did not call McBride; the defense did. The mistrial thereby relieved the prosecutor of the embarrassment of having his own witness exculpate the defendant.[22]

Further, at the first trial the prosecution could not produce two witnesses. The delay occasioned by the declaration of a mistrial gave the police an added opportunity to search for the missing witnesses. While the search in this case proved fruitless, nevertheless, this illustrates the possible advantages to the prosecution of a mistrial.

The possible advantages to the prosecutor incident to declaration of a mistrial suggest the need for caution. When a mistrial is declared after the taking of evidence has begun, strategies of cross-examination are often revealed and the prosecution has, for the first time, learned the real strengths and weaknesses of its case. "Under these circumstances, mistrial exposes defendant not only to the burden of retrial and the possible loss of a favorably disposed tribunal, but also to the possi-

---

[21] The transcript reveals that after the first day of trial there was an off-the-record discussion of a possible declaration of mistrial. In declaring a mistrial, the judge briefly mentioned and dismissed the possibility of a curative instruction.

[22] *United States v Kin Ping Cheung,* 485 F2d 689, 691–692 (CA 5, 1973).

bility that the government will improve the strength of its case significantly in the second prosecution."[23] The Double Jeopardy Clause stands as a protection against precisely these dangers.[24]

While the judge no doubt acted in good faith, good faith is not a factor unless the defendant moves for a mistrial and asserts that his "consent" to a mistrial, thereby evidenced, was constrained by prosecutorial or judicial misconduct or bad faith. In *Dinitz* the Court observed a distinction between *sua sponte* mistrials and mistrials granted at the defendant's request, declaring that where the defendant requests the mistrial, retrials may be barred when the judge or prosecutor acted in bad faith.[25]

Where the defendant does not request or consent to a mistrial, the "manifest necessity" standard governs. " 'In the absence of such a motion, the *Perez* doctrine of manifest necessity stands as a command to trial judges not to foreclose the defendant's option until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a

[23] Schulhofer, *supra,* pp 508–510.

[24] "The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." *Green v United States,* 355 US 184, 187–188; 78 S Ct 221; 2 L Ed 2d 199 (1957).

[25] "The Double Jeopardy Clause does protect a defendant against governmental actions intended to provoke mistrial requests and thereby subject defendants to the substantial burdens imposed by multiple prosecutions. It bars retrials where 'bad-faith conduct by the judge or prosecutor' * * * threatens the '[h]arassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict' the defendant." *United States v Dinitz,* 424 US 600, 611; 96 S Ct 1075; 47 L Ed 2d 267 (1976).

continuation of the proceedings.' " *Dinitz, supra,* p 607.[26]

If appellate courts were to take into account the absence of judicial bad faith in deciding whether there is manifest necessity, a mistrial could be declared *sua sponte* whenever there is an arguable basis for such a declaration; the judge's good faith, not manifest necessity, would define the inquiry.

---

[26] Even if it were clear that the mistrial was declared for Benton's benefit this would not be decisive. *See* text accompanying fn 10.

A trial judge assumes a burden of persuasion when depriving the defendant of his "valued right to have his trial completed by a particular tribunal". *Wade v Hunter,* 336 US 684, 689; 69 S Ct 834; 93 L Ed 974 (1949).

A judge's discretion in such matters is not absolute. The rationale for deferring to the judge so that he or she will not be discouraged from vigilant protection of the defendant has been criticized:

"Defense counsel is as well situated as the judge to assess the impact of incidents that are potentially prejudicial to the accused. The usefulness of mistrial to the defense depends, moreover, not only on the impact of the particular event but also on two other factors— the nature of other circumstances that may have helped or hindered the defendant's cause, and the extent to which the resources of the accused will permit an adequate defense in a second trial. A trial judge normally will have only vague familiarity with the first of these factors and none at all with the second. Deference to the trial judge therefore seems particularly inappropriate when the mistrial decision ostensibly was intended to protect an accused who objected to mistrial or was given no opportunity to do so. In such a case, there is no excuse for not ascertaining defense preferences directly and then honoring them." Schulhofer, *supra,* p 496. *See, also, Curry v Superior Court of San Francisco, supra,* 2 Cal 3d 717.

The United States Supreme Court has noted that "[m]any juries acquit defendants after trials in which reversible error has been committed, and many experienced trial lawyers will forego a motion for mistrial in favor of having his case decided by the jury". *United States v Tateo,* 377 US 463, 474; 84 S Ct 1587; 12 L Ed 2d 448 (1964).

Reprosecution after a *sua sponte* declaration of mistrial because of improperly admitted testimony has been barred on double jeopardy grounds in this and other jurisdictions. *See People v Alvin Johnson, supra* (the mere mention of a polygraph test, without more); *People v Gardner,* 37 Mich App 520; 195 NW2d 62 (1972) (inadmissible reference by prosecution witness to defendant's prior conviction); *Klinefelter v Superior Court of Maricopa County,* 108 Ariz 494; 502 P2d 531 (1972) (state's witness on redirect referred to information which had specifically been excluded); *State v Embry,* 19 Or App 934; 530 P2d 99 (1974) (the prejudicial effect was curable by instruction).

This Court accords considerable deference to a judge's determination of whether there is manifest necessity justifying declaration of a mistrial. *People v Alvin Johnson,* 396 Mich 424, 437; 240 NW2d 729 (1976). A mistrial may only be declared, however, after an on the record consideration and discussion of alternatives with counsel. The wishes of defendant and his counsel can then be ascertained and a full exploration of the alternatives undertaken. In the instant case correct procedures were not followed. Had they been observed the insignificance of the error may have been discovered and proper curative instructions given. Instead, an unnecessary mistrial was declared. We conclude that there was no "manifest necessity" to declare a mistrial.

Reversed.

KAVANAGH, C. J., and WILLIAMS, J., concurred with LEVIN, J.

FITZGERALD, J. *(concurring).* When a defendant consents to a mistrial after jeopardy has attached, ordinarily retrial is not barred. *People v Grimmett,* 388 Mich 590, 598; 202 NW2d 278 (1972). The difficult question in this case is whether or not defendant consented to the mistrial. Following *United States v Dinitz,* 424 US 600, 607–609; 96 S Ct 1075; 47 L Ed 2d 267 (1976), the proper inquiry in answering that question is "whether defendant had primary control" over the course to˙ be followed. *People v Alvin Johnson,* 396 Mich 424, 451; 240 NW2d 729 (1976) (COLEMAN, J., dissenting). While the totality of the circumstances in *Alvin Johnson* revealed that defendant Johnson had control in his case, the record in the instant case does not show that the defendant had control.

Since it is not apparent from the record that defendant consented to the mistrial declaration

and since there was no "manifest necessity" for a mistrial, I concur in reversal.

COLEMAN and RYAN, JJ., concurred with FITZGERALD, J.

BLAIR MOODY, JR., J., took no part in the decision of this case.