# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DEMARIO DESHAWN BONDS,

        Defendant-Appellant.

UNPUBLISHED
August 17, 2017

No. 331776
Genesee Circuit Court
LC No. 13-034148-FC

Before: GLEICHER, P.J., and M. J. KELLY and SHAPIRO, JJ.

PER CURIAM.

A jury convicted defendant of first-degree premeditated murder, MCL 750.316(1)(a), felon in possession of a firearm, MCL 750.224f, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, for the shooting death of Michael Jones. Defendant contends that his January 2016 trial should have been barred on double jeopardy grounds as the prosecution forced him to seek a mistrial at his initial trial by withholding an extensive investigative file until the second day of the proceedings. Defendant further challenges the trial court's midtrial admission of other acts evidence against him when the prosecution failed to give timely notice. Although errors did occur, none were outcome determinative. We therefore affirm.

## I. PRETRIAL BACKGROUND

In the early morning hours of July 7, 2011, Jones was shot several times in the back at the Atherton Terrace apartment complex in Flint. In 2013, a large-scale investigation into gang activity conducted by the FBI and local law enforcement agencies linked defendant to the killing. Due to the complexity of the ongoing investigation, delays in the prosecution providing discovery, and the various federal and state charges levied against multiple necessary witnesses in this case, two more years elapsed before defendant stood trial.

On the second trial day, the prosecution intended to call Flint Police Lieutenant Cynthia Herfert to the stand. Herfert had been one in a long line of chief investigating officers assigned to the Jones murder case. She arrived in court with voluminous investigation records that had not been shared with the prosecutor or the defense. Defense counsel requested a mistrial:

> Well, your Honor, on behalf of my client, we are asking for a mistrial at
> this particular time. We did file a discovery request and even throughout - - up

-1-

until today, we were still receiving some additional discovery, most of which that we received up until today I could've dealt with. But unfortunately, I realize that there is a whole stack of interviews, cell phone records, and numerous CD's of interviews of witnesses that are listed by the prosecution and some that are not listed by the prosecution; and I cannot in all good conscience continue to represent my client during this trial without asking for a mistrial because I have no idea what's on it. Some of which may be [*Brady*] material . . . . It looks like a lot of work yet to be done on additional discovery that was not provided to me after my request under 6.201.

For the record, I'm not faulting [the prosecutor] on that because I believe that she did not have the materials to turn over to me, but it was within, you know a - - one of the detectives with the Flint Police Department. I would ask my client, Mr. Bonds, do you consent with the request for the mistrial, and if we do get it, this jury will be discharged and it will be reset down the road. . . .

Defendant expressed his consent.

The prosecutor agreed with the defense's request for a mistrial and explained, "no way was this intentional on the People's part at all. As soon as [Lieutenant Herfert] brought over the file, I looked in there and noticed that there was new stuff and I immediately came up, told counsel. . . ." The court expressed frustration, but granted the motion.

Defendant subsequently filed a motion to dismiss the charges against him on double jeopardy grounds based on the late presentation of Herfert's investigation file. Defendant reiterated that it did not appear that the prosecutor attempted to mislead the court and "was totally unaware of this additional information" until presented by the officer.

However, it is understood that the Prosecution asked the present Detectives to obtain any and all reports from the original Detectives in this matter, including Lt. Herfert. It was told to the Prosecution and Defense that there were no other reports. However, Lt. Herfert, had indicated that she had the reports all the time and no one asked her for the reports. It appears that there is some misleading information as well as possibility of misconduct on the [part of some] of the police agencies.

Because of the police agencies' misconduct and the volume of new information provided on the second trial day, defense counsel asserted he "was forced to request a mistrial" and "Defendant concurred in that."

Citing *Oregon v Kennedy*, 456 US 667; 102 S Ct 2083; 72 L Ed 2d 416 (1982), defendant contended that a retrial was not permitted because "the conduct that [gave] rise to the mistrial was the Government[']s conduct which to [sic] provoke the Defendant into moving for a mistrial." Defendant argued that the prosecutor should be held responsible for the conduct of the police agencies pursuant to *Kyles v Whitley*, 514 US 419; 115 S Ct 1555; 131 L Ed 2d 490 (1994), and *United States v Price*, 566 F3d 900 (CA 9, 2009). "Someone must be held accountable" for the failure to present requested material, defendant insisted, as he had waited

"in jail for 3 years . . . only to be forced into requesting a mistrial because to go forward with that much material as well as prior statements of witnesses that was not disclosed to Defense Counsel and the idea of other potential witnesses that were not disclosed" would violate defendant's constitutional rights.

The prosecutor laid the blame on the FBI taskforce involved in this case. The FBI taskforce never informed Herfert that it was taking over the case, only that it was "inquiring" into the matter. As a result, Herfert continued her independent investigation, ignorant of the fact that the prosecutor was engaged in discovery and proceeding toward trial. The prosecutor repeatedly asked the FBI agent in charge of the case if any other investigative files existed and he always answered in the negative.

The prosecutor argued against dismissal because neither she nor other government agents engaged in misconduct. Rather, this was a case of "miscommunication between the agencies" that "was beyond the People's control." Relying upon *People v Dawson*, 431 Mich 234, 252-253; 427 NW2d 886 (1988), the prosecutor contended that dismissal of the case on double jeopardy grounds was improper under these circumstances. The prosecutor further asserted that defendant waived his challenge by consenting to the mistrial.

At the hearing on defendant's motion, defense counsel asked that the prosecutor be held "vicariously liable for what the police did and did not do." The court acknowledged that the prosecutor informed the court and defense counsel that Herfert came to trial with voluminous materials. The court further noted that defense counsel asked for the mistrial and the court granted the request "with the consent of the defendant." Noting that Herfert's investigatory materials had now been disclosed and defendant had been given additional time to prepare, the court denied the motion to dismiss.

## II. DOUBLE JEOPARDY

We review de novo a defendant's claim that retrial is barred on double jeopardy principles. *People v Nutt*, 469 Mich 565, 573; 677 NW2d 1 (2004). A trial court's factual findings pertaining to whether the prosecutor sought to "goad" a defendant into seeking a mistrial are reviewed for clear error. *Dawson*, 431 Mich at 258. "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made." *People v Mullen*, 282 Mich App 14, 22; 762 NW2d 170 (2008).

"The United States and Michigan Constitutions protect a person from being twice placed in jeopardy for the same offense. US Const, Am V; Const 1963, art 1, § 15." *Nutt*, 469 Mich at 574. "Generally, jeopardy attaches in a jury trial once the jury is empaneled and sworn." *People v Ackah-Essien*, 311 Mich App 13, 32; 874 NW2d 172 (2015). Once the jury is sworn, the defendant has a protected right to have his trial completed before and decided by that jury. *Id.*; see also *People v Lett*, 466 Mich 206, 214; 644 NW2d 743 (2002). "If the trial is concluded prematurely, a retrial for that offense is prohibited unless the defendant consented to the interruption or a mistrial was declared because of a manifest necessity." *Ackah-Essien*, 311 Mich App at 32; see also *People v Echavarria*, 233 Mich App 356, 363; 592 NW2d 737 (1999) (holding that retrial following a mistrial is permissible "where manifest necessity required the

mistrial or the defendant consented to the mistrial and the mistrial was caused by innocent conduct on the part of the prosecutor or judge, or by factors beyond their control").

Relevant to the case at hand, retrial following a mistrial is permitted when the defendant asks for or consents to the declaration of a mistrial. *Lett*, 466 Mich at 215. But it is not permitted when "the prosecutor has engaged in conduct intended to provoke or 'goad' the mistrial request." Id.; see also *Dawson*, 431 Mich at 253 ("Where a defendant's motion for mistrial is prompted by intentional prosecutorial misconduct, however, the defendant may not, by moving for a mistrial, have waived double jeopardy protection."). This is a question of intent. Prosecutorial misconduct standing alone is insufficient to trigger double jeopardy protections; the prosecutor must have intended to push the defendant into a corner leaving mistrial as the only escape. *Kennedy*, 456 US at 675-676.

There simply is no record indication that the prosecutor possessed the intent to force defendant into requesting or consenting to a mistrial. Defendant conceded that the prosecutor was just as ignorant of Herfert's investigation file as he was. There also is no record indication that any police or FBI agent acted with any ill intent. Rather, as found by the trial court, it appears that the investigators were only negligent. "Where a mistrial results from apparently innocent or even negligent prosecutorial error . . . the public interest in allowing a retrial outweighs the double jeopardy bar." *Dawson*, 431 Mich at 257. Accordingly, the trial court did not clearly err in ruling that the prosecutor did not goad or provoke defendant into requesting a mistrial.

Defendant complains that as a result of the mistrial, the prosecution was given additional time to investigate and strengthen its case. In *People v Benton*, 402 Mich 47, 52, 54; 260 NW2d 77 (1976), the Supreme Court reversed a trial court's sua sponte mistrial declaration based on the prosecutor's improper impeachment of a witness. Citing *Illinois v Somerville*, 410 US 458, 469; 93 S Ct 1066; 35 L Ed 2d 425 (1972), *Benton*, 402 Mich at 62, noted that the defendant was prejudiced because the delay of the mistrial allowed the prosecutor sufficient time to track down two missing witnesses who strengthened the case against him. Here, the prosecutor gained a considerable quantity of previously unknown material, including (as discussed in the next issue) witness interviews suggesting a history of bad blood between defendant and the victim. But the defense gained the same investigative material at the same time as the prosecutor. The delay afforded *both* parties an opportunity to further develop their cases.

In addition, defendant conflates the requirements pertaining to mistrials with the proscriptions and requirements pertaining to prosecutorial conduct when a *Brady* violation is found or suspected. *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963). There is a general rule that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id*. at 87 (citation omitted). The prosecution "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles*, 514 US at 437. The prosecutor remains duty-bound to gauge the effect and exculpatory value of evidence and to ensure its disclosure "regardless of any failure by the police to bring favorable evidence to the prosecutor's attention." *Id*. at 421.

When it is discovered *after* trial that the prosecution (or the police) withheld exculpatory evidence, the defendant is entitled to a new trial with the benefit of the now-disclosed evidence. See *id*. at 421-422. The defendant is not entitled to dismissal of the charges. Here, the undisclosed investigation file was revealed on the second day of defendant's first trial. A mistrial was declared and the matter rescheduled for several months later, allowing defendant time to review the materials. This is all that would be required under *Kyles* and defendant's attempt to create a right to dismissal on double jeopardy grounds is unavailing.

### III. SECOND TRIAL BACKGROUND

Leading up to defendant's second trial, both parties were able to review Lieutenant Herfert's file regarding the early stages of the Jones murder investigation. On October 10, 2011, Herfert questioned Charles Jones, the victim's father. Charles described that a "week before [the] homicide," the victim "got tied up & beat" "in [the] basement." A person named "Wonnie" "dragged [the victim] to [the] basement" and "tied him up." "J.R." and Frank Hogg hit Jones with a pistol. Defendant dropped weights on Jones. Charles indicated that Corey Woolfolk was present during the attack but he "just stood there."

On December 20, 2011, Woolfolk provided a statement to Herfert. In relation to Charles's allegations, Woolfolk stated, "I don't know why [defendant] dropped weights on [Jones] the week before. I heard he got pistol whipped by [defendant] the week before he got killed. [Jones] told me that. I don't know why they were having problems."

On the third day of defendant's retrial, the prosecutor called Jones's brother, Jamar Jones, to the stand. The prosecutor asked Jamar, "Do you know anything about [Jones] getting beat up in a basement a week before this happened?" Defense counsel objected on relevancy grounds, but the court permitted the line of inquiry. Jamar indicated that Rodney Frisby told him about the earlier assault. The prosecutor then stated, "Okay. Then we'll leave that alone[.]"

Later that day, defense counsel protested that the prosecutor should not be permitted to develop testimony regarding the basement assault because she had not filed notice of her intent to introduce other acts evidence under MRE 404(b). The prosecutor responded that MRE 404(b) was not applicable because the evidence was "just something that goes to motive of why - - what happened." The prosecutor conceded that she planned to call witnesses to testify regarding the earlier incident. She continued that she originally thought Woolfolk would be the witness to testify regarding the incident, but at that time, she intended to question Frisby about the assault instead.

The court opined that MRE 404(b) appeared to apply and the prosecutor promised to file a motion seeking admission of the evidence. She asserted that good cause existed to grant the motion midtrial. She further noted that defendant could not claim surprise because defense counsel had the same notes regarding the basement assault. Defense counsel complained that the late notice impacted his ability "to defend against it." "We're in day three of this trial and . . . there's no way we can defend against all that at this particular point in time. We're prepared to defend against the accusation on July 7th, 2011." The court declined to rule on the issue at that time and the prosecutor filed a motion to admit other acts evidence during the lunch break.

In her motion, the prosecutor posited that defendant killed Jones because he believed Jones "had something to do with the homicide" of one of defendant's relatives—Sonny. The prosecutor "believe[d]" that Frisby would testify that a week before the murder, defendant was "in a basement" with Jones and "pistol whipped the victim and dropped weights on the victim." The prosecutor believed Woolfolk would testify that Jones told him about this assault. The prosecutor contended that the evidence was offered to prove motive, not propensity; "why the Defendant shot is a fact of consequence at trial;" and the evidence was highly probative to establish motive and yet not unfairly prejudicial.

At the start of the fourth trial day, the prosecutor indicated that she had spoken to Officer Michael Angus regarding the "basement" incident and got "confirmation . . . that it did happen; [Frisby and Woolfolk] were both there and it was over [defendant's relative's] death." The prosecutor later reiterated that Officer Angus had spoken to Frisby and Woolfolk that morning in the courthouse and confirmed with them that they "were actually present where this defendant pistol whipped the victim, dropped weights on him because of the death of someone named Sonny who was either related to or friends with the defendant." The prosecutor contended that the evidence was admissible to establish motive and plan.

Defendant again argued that the prosecutor had not established good cause to belatedly admit the evidence. Defendant noted that this was the second trial and the case had been pending for over two years. Even so, the prosecutor waited until the middle of the second trial to provide any notice. Defendant further asserted that he was prejudiced by the late notice: "If I would have known the prosecution was planning to introduce, you know, this purported incident I would have voir dire[d] it differently with questioning about, you know, other acts; I would have given a different opening statement, and I may have cross-examined some of the witnesses differently."

The prosecutor asserted that she could not provide notice sooner because she did not know that she was going to use the evidence until that day:

> *Ms. Hanson.* Your Honor, motive is always relevant and I wasn't sure until actually this morning that this happened. We had it in notes; I'm at - - it was never testified to before. Officer in Charge Angus talked to them this morning and did confirm that that in fact did happen. So I would ask that we be allowed to have these witnesses talk about this for motive and for Premeditation.

> *Mr. Piazza.* And, your Honor, the prosecution was well aware of something occur [sic] relating to a basement incident in prior reports; but they failed to give notice to indicate that they were going to use it prior to trial.

> *Ms. Hanson.* I wasn't going to ask to use it if I didn't know it was even true, and we did not talk to them until this morning; so I would ask that we be allowed to do it.

* * *

> *Ms. Hanson.* . . . This was all provided to council [sic] ahead of time; these notes I just didn't know if it was even anything that was true, I didn't want

to go into it without first asking the witnesses if in fact it was something that really happened. They've indicated this morning to Sergeant Angus that it did happen.

The trial court ultimately ruled in favor of admission. It found good cause for delay in notice as defense counsel was aware of the incident through the investigation notes and because the prosecution wanted to confirm the veracity of the story with the witnesses. As the witnesses were incarcerated, the prosecutor "could not confirm it in the most typical way which would be in a more general interview prior to trial."

The prosecution then called Frisby to the stand. Frisby testified that at the time of the murder, he lived in "the yellow house" near the Atherton Terrace apartments where Jones was shot. In addition to testifying about Jones's murder, Frisby asserted that "a couple weeks before" the shooting defendant confronted Jones at the yellow house about having "something to do with" the murder of defendant's "brother" Sonny. Woolfolk and Hogg were also present. Defendant hit Jones with a gun in the home's kitchen. Frisby claimed he told defendant to stop but "somehow it ended up in the basement afterwards," where defendant continued hitting Jones. On cross-examination, Frisby admitted that while Jones was in the basement, Frisby started a weed whacker and "put it on [Jones's] face." Frisby further conceded that he asked Jones whether he had anything to do with Sonny's murder, but that Jones denied it.

Woolfolk described that Frisby assaulted him about a week before Jones's murder because Frisby suspected that that Woolfolk had played a role in Sonny's murder. Woolfolk was in the yellow house playing video games when Frisby hit him, choked him, and put a gun to his head. Defendant arrived. Frisby pointed a gun at Hogg and Juawone Jones (who is not related to the victim) "and told them to grab my gun out of the drawer." Frisby placed the gun on his hip and instructed Hogg and Juawone to tie up Woolfolk. Frisby then directed Juawone to lure Jones to the house with the promise of "females." When Jones entered, defendant and Frisby "start[ed] smacking him with the gun." Frisby then bound Jones and he and defendant dragged Jones to the basement where they tied him to a pole. Frisby repeatedly asked Jones why he tried to kill him and threatened Jones with a weed whacker. Defendant continued to hit Jones. On cross-examination, defense counsel emphasized that Frisby, not defendant, was the ring leader during the assault, and that Frisby had tied up Jones, dragged him to the basement, and placed a running weed whacker to Jones's face.

Defendant called Hogg as a defense witness. Hogg denied that the assault occurred.

## IV. OTHER ACTS EVIDENCE

Defendant continues to challenge the admission of evidence regarding Jones's basement assault.[1] We review a trial court's decision to admit evidence for an abuse of discretion and

---

[1] The prosecutor also defends the admission of certain statements allegedly made by defendant during the basement assault. Defendant never challenged the admission of these statements and

underlying legal issues de novo. *People v Duenaz*, 306 Mich App 85, 90; 854 NW2d 531 (2014).

"Generally, character evidence cannot be used to show that a defendant acted in conformity therewith because there is a danger that a defendant will be convicted solely on his history of misconduct rather than on his conduct in a particular case." *People v Henry*, 315 Mich App 130, 140; 889 NW2d 1 (2016). In accordance with MRE 404(b):

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

"MRE 404(b) does not prohibit all other-acts evidence that may give rise to an inference about the defendant's character, but only that which is relevant solely to the defendant's character or criminal propensity." *People v Jackson*, 498 Mich 246, 276; 869 NW2d 253 (2015) (quotation marks and citation omitted). Other acts evidence is admissible under MRE 404(b) "if: (1) it is offered for a proper purpose, (2) it is relevant, and (3) its probative value is not substantially outweighed by its potential for unfair prejudice." *Henry*, 315 Mich App at 140-141.

Defendant does not challenge the relevance of the other acts evidence or the purpose asserted by the prosecutor for its admission. Rather, defendant contends that the evidence was inadmissible because the prosecutor's failure to provide pretrial notice caused him prejudice arising from defense counsel's inability to voir dire the potential jurors, address the testimony in his opening statement, and engage in the cross-examination of witnesses on the evidence earlier in the trial.

In accordance with MRE 404(b)(2):

> The prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial and the rationale, whether or not mentioned in subparagraph (b)(1), for admitting the evidence. If necessary to a determination of the admissibility of the evidence under this rule, the defendant shall be required to state the theory or theories of defense, limited only by the defendant's privilege against self-incrimination.

The purposes underlying the notice requirement include:

they were not the subject of the trial court's order. Accordingly, we need not consider the prosecutor's arguments in this regard.

-8-

(1) to force the prosecutor to identify and seek admission only of prior bad acts evidence that passes the relevancy threshold, (2) to ensure that the defendant has an opportunity to object to and defend against this sort of evidence, and (3) to facilitate a thoughtful ruling by the trial court that either admits or excludes this evidence and is grounded in an adequate record. [*People v Hawkins*, 245 Mich App 439, 454-455; 628 NW2d 105 (2001).]

As explained in *Jackson*, 498 Mich at 260-261 (citations and quotation marks omitted), the purpose of the MRE 404(b)(2) notice requirement is "to assist the trial court in this extraordinarily difficult context and to promote the public interest in reliable fact finding." Further:

Requiring the prosecution to give pretrial notice of its intent to introduce other acts evidence at trial is designed to promote reliable decision making, to prevent unfair surprise, and to offer the defense the opportunity to marshal arguments regarding both relevancy and unfair prejudice. The notice must be reasonable and provided before trial, but may be provided during trial if the court excuses pretrial notice on good cause shown. And as its plain terms make clear, this notice requirement is coextensive with and reflective of MRE 404(b)'s inclusionary nature, applying to any [other-acts] evidence the prosecution in a criminal case intends to introduce at trial, regardless of whether the rationale . . . for admitting the evidence is mentioned in subparagraph (b)(1). [*Id.* at 261-262 (citations, brackets and quotation marks omitted, ellipsis in original).]

We agree with defendant's assessment that the prosecutor's stated reasons for failing to give notice were flimsy at best. The prosecutor could have visited Frisby and Woolfolk in prison at any time to interview them and learn more about the alleged basement assault. These witnesses were not in out-of-state federal facilities. Woolfolk was housed in a Jackson facility and Frisby in Ionia. Both were transferred to Genesee County on January 5, 2016. Accordingly, the prosecutor or Officer Angus could have spoken to the witnesses before jury voir dire was completed. At the very least, the prosecutor could have verified the story and made an oral motion before opening statements.

Moreover, it was unreasonable for the prosecutor to believe that the violent interaction between defendant and Jones one or two weeks before the murder was part and parcel of the charged offense and not an "other act" as contemplated by MRE 404(b), negating the notice requirement. "[E]vidence of acts other than the charged conduct is 'intrinsic' to that conduct and thus not subject to 404(b) scrutiny if the uncharged acts 'directly prove[] the charged offense' or if they 'were performed contemporaneously with' the charged offense and 'facilitated [its] commission.' " *Jackson*, 498 Mich at 263, quoting *United States v Green*, 617 F3d 233, 248-249 (CA 3, 2010). Certainly, evidence that defendant participated in a violent attack on Jones shortly before the murder is relevant to establishing defendant's guilt on the premeditated murder count. It gives defendant a motive and allows the jury to infer that defendant thought about killing Jones before doing so. As this was not direct evidence or evidence of a contemporaneous act, it was subject to MRE 404(b)'s notice requirement. As explained by the Court of Appeals for the Third Circuit in *Green*, 617 F3d at 249, " 'background' evidence will remain admissible" but "the proponent will have to provide notice of his intention to use the evidence, and identify the

specific, non-propensity purpose for which he seeks to introduce it (*i.e.*, allowing the jury to hear the full story of the crime.)"

Although we question the trial court's finding of "good cause" to excuse the requirement of timely pretrial notice, we cannot conclude that defendant is entitled to a new trial. The admission of MRE 404(b) evidence without proper notice is subject to harmless error review. *Jackson*, 498 Mich at 276. Relief is only warranted when the error causes outcome-determinative prejudice. *Id*. at 279. Typically, other-acts evidence may result in unfair prejudice if the evidence "inject[s] considerations extraneous to the merits of the lawsuit." *People v Pickens*, 446 Mich 298, 337; 521 NW2d 797 (1994) (quotation marks and citation omitted). "Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury." *People v Crawford*, 458 Mich 376, 398; 582 NW2d 785 (1998).

Defendant contends he was prejudiced because he would have tailored his voir dire, opening statement, and cross-examination of earlier witnesses to meet the evidence of the events in the basement. If the prosecutor had provided timely notice of her intent to employ other acts evidence, defense counsel contended that he would have questioned potential jurors to determine their tendency to convict defendant of the current charge based on the conclusion that he committed other uncharged bad acts. Defendant has not specifically explained how counsel would have altered his opening statement, but he likely would have asserted that evidence would disprove the earlier act. And although defendant does not indicate how counsel could have tailored his cross-examination of the prosecution witnesses, we note that counsel could have questioned Charles about his statement and Juawone about what he saw that day.

Nevertheless, defendant's inability to address the evidence earlier in the trial was not outcome determinative. Defendant had received the notes referencing the basement assault three months before trial. Defense counsel effectively cross-examined Frisby to emphasize Frisby's role in the attack. Woolfolk actually placed the bulk of the blame on Frisby and claimed that the Frisby was the driving force behind the assault because Frisby believed that Jones was attempting to kill him, not because defendant believed Jones had killed Sonny. And Hogg, who was allegedly in the room during the assault, denied that the assault even occurred. Defendant was able to use this information to his advantage. During closing argument, defense counsel reminded the jury that defendant and Jones amicably drove to Frisby's house together on the day of the murder, discrediting Frisby's testimony that defendant had assaulted Jones only a week or two earlier. Defense counsel further outlined evidence suggesting that Frisby actually shot Jones.

Moreover, ample evidence substantiated defendant's guilt even absent the basement assault. Several witnesses placed defendant outside with Jones at the time of the shooting. Others described defendant's strange conduct before and after the shooting and reported that they observed defendant carrying a gun. Jones's brother, Jamar, testified that defendant admitted to him that he killed Jones.

Ultimately, the trial court instructed the jury at the close of trial to limit its review of the other acts evidence to proper purposes and not to make any improper inferences regarding defendant's character. Such limiting instructions "can help to alleviate any danger of unfair

prejudice, given that jurors are presumed to follow their instructions." *People v Roscoe*, 303 Mich App 633, 646; 846 NW2d 402 (2014). On this record, we discern no ground to grant defendant relief.

We affirm.

/s/ Elizabeth L. Gleicher
/s/ Michael J. Kelly
/s/ Douglas B. Shapiro